TELLIN v FORSYTH TOWNSHIP

Docket No. 293590. Submitted January 11, 2011, at Lansing. Decided
    January 25, 2011. Approved for publication March 10, 2011 at 9:00
    a.m..

Minors Emily Tellin, by her next friend Lori Hinga, and Matthew
    Werfelman, by his next friend Andrea Detamble, brought an action
    against Forsyth Township and West Branch Township for injuries
    they suffered when a steel I-beam that had been installed to
    support a roof overhang fell. The roof overhang was attached to
    the K. I. Sawyer Learning Center, which West Branch Township
    leased from Forsyth Township and operated in part as a library.
    The library was closed when the incident occurred, but a library
    drop box located under the overhang was open 24 hours a day.
    Defendants moved for summary disposition under MCR
    2.116(C)(7) on the basis of governmental immunity from tort
    liability under MCL 691.1407(1). The trial court, Thomas L. Solka,
    J., denied the motion, ruling that defendants had failed to repair or
    maintain a public building that was under their control and open
    for public use as required by MCL 691.1406, the public-building
    exception to governmental immunity. Defendants appealed.

    The Court of Appeals *held*:

    The trial court properly denied defendants' motion for sum-
    mary disposition. The placement of the steel I-beam configuration
    constituted a failure to repair or maintain the building rather than
    a design defect because it was a preventive measure to supplement
    and coincide with the existing structure rather than a redesign of
    the roof overhang. Because the drop box was open to the public 24
    hours a day, the building was open for public use for purposes of
    the public-building exception. Although plaintiffs were not using
    the drop box and a sign prohibited loitering in the area where
    plaintiffs were injured, plaintiffs were not loitering when the
    incident occurred. Finally, defendants had received actual notice
    from a Learning Center volunteer that the I-beam was not
    properly secured and might be unstable.

    Affirmed.

1. GOVERNMENTAL IMMUNITY — PUBLIC-BUILDING EXCEPTION — DESIGN DEFECTS — FAILURES TO REPAIR OR MAINTAIN.

Under the public-building exception to governmental immunity from tort liability, a design defect is a dangerous condition inherent in the design itself, such as its characteristics, functioning, and purpose; in contrast, a failure to repair or maintain is caused by extrinsic circumstances, such as a malfunction, deterioration, or instability of part of the building or the improper securing, construction, or installation of a fixture that is part of the building; reparative or preventative measures may supplement the existing structure to preserve the existing design, and an action that was originally a design decision could be transformed into a failure to repair or maintain by subsequent improper installation, malfunction, deterioration, or instability (MCL 691.1406, 691.1407[1]).

2. GOVERNMENTAL IMMUNITY — PUBLIC-BUILDING EXCEPTION — BUILDING OPEN TO THE PUBLIC.

A building is open to the public for purposes of the public-building exception to governmental immunity from tort liability if any part of it remains open to the public; in determining whether a building is open to the public, the focus is on the intended use of the building and not merely on the hours of operation (MCL 691.1406, 691.1407[1]).

*Weisse, Rettig, Rademacher, Clark & Bray, P.C.* (by *Richard C. Clark*), for plaintiffs.

*Bensinger, Cotant & Menkes, P.C.* (by *Glenn W. Smith*), for defendants.

Before: SAWYER, P.J., and WHITBECK and WILDER, JJ.

PER CURIAM.

### I. OVERVIEW

In July 2006, plaintiffs Emily Tellin and Matthew Werfelman were visiting the K. I. Sawyer Learning Center, located in Forsyth Township, Michigan. Plaintiffs were injured when an I-beam was dislodged and fell on them. Plaintiffs sued, and defendants Forsyth Township

and West Branch Township (the Townships) moved for summary disposition under MCR 2.116(C)(7), asserting that they were immune from suit pursuant to the governmental immunity doctrine.[1] The trial court denied the motion, ruling that the Townships were not entitled to immunity because plaintiffs demonstrated the existence of a failure to repair or maintain under the public-building exception to the governmental immunity doctrine.[2] The Townships appeal as of right the trial court's denial of their motion for summary disposition. We affirm.

## II. FACTS

Before the incident at issue, the Learning Center building had existed for approximately 40 years as part of the former K. I. Sawyer Air Force Base before the federal government deeded it to defendant Forsyth Township. At some point, Forsyth Township leased the building to West Branch Township. In 2002, West Branch Township moved library books into the Learning Center. Sometime between 2002 and 2005, the Learning Center was structurally modified from a four-unit living area to its current one-unit form. Apparently, each unit previously had independent entryways. During the remodeling, the entryways were reconfigured from four separate entrances to a single, main entrance. The Townships opened the Learning Center to the public sometime in 2004.

Before 2003, a roof overhang above the main entrance of the Learning Center had been supported by wooden columns. However, in 2003, Wes Miller, the husband of the Learning Center's then current director,

---

[1] MCL 691.1407(1).

[2] MCL 691.1406.

brought a steel I-beam configuration to the Learning Center. The configuration included a horizontal steel I-beam with a vertical steel post welded at each end of the I-beam. Apparently, Miller delivered this I-beam configuration with the supporting steel columns already welded to the I-beam. According to Susan McNeil, one of the librarians, Miller said that the I-beam configuration would supplement the existing beam-and-column configuration of the roof overhang in case the snow load on the overhang became too heavy. However, there is no indication that the director, the governing board, or any other authority found extra support necessary or authorized the installation of the I-beam configuration. Rather, Miller, or someone from the Learning Center's staff, asked local Navy Seabee volunteers to help install the I-beam configuration under the awning within the roof overhang's existing beam-and-column structure. The parties agree that this I-beam configuration was secured only through downward compression of the existing roof overhang—there was nothing externally or internally securing it to the building or the concrete slab on which it sat. Neither Miller, his wife, nor the Townships had any inspectors examine the installation to determine whether it was up to code or passed safety regulations.

At some point after the I-beam configuration was installed, Michael Erdmann, a volunteer who had previously performed some maintenance projects at the Learning Center, kicked the I-beam configuration or applied some force to it to determine whether it was properly secured. Thereafter, Erdmann spoke with McNeil and allegedly explained that he thought someone might be able to move the I-beam configuration or that it seemed loose. There is some discrepancy over the exact substance of Erdmann's conversation with Mc-

Neil about the stability of the I-beam configuration.
Regardless, the Townships did not take any action after
Erdmann allegedly voiced his concern.

On July 18, 2006, at around 8:00 p.m., 13-year-old
Emily Tellin and her friend, Tiffany Grondin, left the
Salvation Army building, which is a neighboring build-
ing that contained recreational activities such as bas-
ketball and various games. The two went to the Learn-
ing Center to stand under the roof overhang adjacent to
the entrance of the building and wait for Tellin's
mother to pick them up. Matthew Werfelman and at
least two other children joined them.

Grondin started swinging or twisting around the
steel pole portion of the I-beam configuration. Grondin
described the I-beam configuration as "wobbly" as she
swung. She then leaned up against it after she became
dizzy, approximately 20 seconds later. The I-beam con-
figuration then started to dislodge and fall toward the
Learning Center, sliding from underneath the over-
hang. As the I-beam fell, the force of the I-beam pushed
Tellin to the ground. Allegedly, Tellin broke her hand
from attempting to catch the I-beam configuration as it
fell. Werfelman fractured his arm when the I-beam fell
on him.

At the time of this incident, the interior of the
library was closed for the day. However, the parties do
not dispute that the Learning Center had a 24-hour
book drop box, which was still open to receive book
returns, located under the roof overhang area where
the I-beam configuration stood. In the window under
the Learning Center's roof overhang awning were
two signs: one read "No Loitering" and the other
instructed the public to deposit their books in the
drop box under the roof overhang. McNeil testified
that the "No Loitering" sign had been placed in the

window to address an ongoing vandalism problem. The sign indicating that books were to be deposited in the drop box also contained a notice that the library was moving to a different location. In its recitation of the facts, the trial court stated that the library was closed because of the move and that the moving process had already begun when this incident occurred. However, McNeil testified that the decision to move occurred after the incident and was based partly on the incident, and partly on the ongoing problems that the library had with vandalism.

Plaintiffs, through their next friends, sued the Townships, alleging that the Townships were liable under the public-building exception to the governmental immunity doctrine on the basis of their failure to repair and maintain the Library Center. Plaintiffs alleged that "[t]he overhang and beam were defective and dangerous because the vertical beam structure was not anchored to the horizontal portion of the overhand [sic] nor the surface of the base." Plaintiffs further alleged that "[a] reasonable maintenance and inspection schedule would have resulted in the discovery of the structure's instability and need for repair."

The trial court found that the Learning Center was a public building and that the steel I-beam configuration was part of that public building. Additionally, the trial court found that the Learning Center was open to the public, despite the fact that the incident occurred after hours, because of the location of the 24-hour book depository under the roof overhang. With regard to whether this was a design defect, the trial court held as follows:

> I do find the inspection by the volunteer, then relating the results of that inspection to the paid librarian, rises to the level of maintenance of that part of the public

building that was open to the public and not design. The fact that it may have been a defective design, if there is later maintenance of that defective design or inspection, the fact that it was also defectively designed, in this Court's judgment, does not then eliminate liability from maintenance of a defectively designed structure by way of inspection.

Finally, the trial court concluded that the Townships were on notice when Erdmann told McNeil his concerns about the structure. Therefore, the trial court concluded that the Townships were not entitled to governmental immunity because plaintiffs demonstrated the existence of a failure to repair or maintain under the public-building exception. Accordingly, the trial court denied the Townships' motion for summary disposition. The Townships now appeal.

### III. THE PUBLIC-BUILDING EXCEPTION

#### A. STANDARD OF REVIEW

This Court reviews de novo questions of law regarding governmental immunity.[3] This Court also reviews de novo motions for summary disposition under MCR 2.116(C)(7).[4] To survive a (C)(7) motion based on governmental immunity, a "plaintiff must allege facts justifying the application of an exception to governmental immunity."[5] In reviewing a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party.[6] Also, this Court reviews de novo questions of statutory construction.[7]

---

[3] *Pierce v Lansing*, 265 Mich App 174, 176; 694 NW2d 65 (2005).

[4] *Id.*

[5] *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001).

[6] *Pierce*, 265 Mich App at 176-177.

[7] *Grimes v Dep't of Transp*, 475 Mich 72, 76; 715 NW2d 275 (2006).

B. GOVERNMENTAL IMMUNITY STANDARDS

Absent an exception, a governmental agency such as a township[8] is generally immune from tort liability when it is engaged in the discharge of a governmental function.[9] And the operation of a government-owned library is a governmental function.[10] Courts are required to broadly construe the term "governmental function," while strictly construing exceptions to governmental immunity.[11] One of these exceptions is the public-building exception.[12] Under the public-building exception, "[g]overnmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public."[13] A plaintiff must prove all of the following to bring suit against the governmental agency:

> (1) a governmental agency is involved, (2) the public building in question is open for use by members of the public, (3) a dangerous or defective condition of the public building itself exists, (4) the governmental agency had actual or constructive knowledge of the alleged defect, and (5) the governmental agency failed to remedy the alleged defective condition after a reasonable amount of time.[14]

The parties do not dispute that the Learning Center was run by a governmental agency or that the building

---

[8] See MCL 691.1401(a), (b), and (d) (defining governmental agencies to include political subdivisions, which include municipal corporations, which include townships).

[9] MCL 691.1407(1); *Stringwell v Ann Arbor Pub Sch Dist*, 262 Mich App 709, 712; 686 NW2d 825 (2004).

[10] See *Fane*, 465 Mich at 74-75.

[11] *Kerbersky v Northern Mich Univ*, 458 Mich 525, 529; 582 NW2d 828 (1998).

[12] MCL 691.1406; *Kerbersky*, 458 Mich at 529.

[13] MCL 691.1406.

[14] *Renny v Dep't of Transp*, 478 Mich 490, 496; 734 NW2d 518 (2007); see MCL 691.1406.

itself was a public building. The parties further agree that the I-beam configuration was part of the building because it was physically connected to the building.[15] However, as we will discuss, the parties dispute whether the building was open for use by members of the public, whether the I-beam configuration was a defective condition as courts have interpreted that term, and whether the Townships had actual or constructive knowledge of the alleged defect.

### C. DEFECTIVE DESIGN OR FAILURE TO MAINTAIN

The Townships argue that as governmental agencies they are immune from claims of design defects in their public buildings, which includes alleged defects in redesigns. According to the Townships, the placement of the steel I-beam configuration was simply a redesign decision that altered the initial conception of the building. And the Townships point out that the structure was in place, without issue, for three years before this incident.

The public-building exception excludes claims of design defects.[16] Therefore, to avoid governmental immunity, a plaintiff must assert a claim that the defective condition was the result of a failure to repair or maintain.[17] Accordingly, the salient question is whether plaintiffs' injuries from placement of the I-beam configuration were the result of a design defect, or a failure to repair or maintain.

A court must give effect to the Legislature's intent when construing a statute.[18] In determining the Legis-

---

[15] See *Fane*, 465 Mich at 78; see also *Horace v City of Pontiac*, 456 Mich 744, 756 n 9; 575 NW2d 762 (1998) (noting that the public-building exception can apply to structures that are part of the building itself).

[16] *Renny*, 478 Mich at 505.

[17] *Id.* at 506-507.

[18] *People v Libbett*, 251 Mich App 353, 365-366; 650 NW2d 407 (2002).

lature's intent, this Court first looks at the language of the statute itself.[19] This Court gives the words of the statutes their plain and ordinary meaning and will look outside the statutory language only if it is ambiguous.[20] "The Legislature is presumed to be familiar with the rules of statutory construction and, when promulgating new laws, to be aware of the consequences of its use or omission of statutory language . . . ."[21] In determining the plain meaning of the statute, this Court uses the "fair and natural import of the terms employed" and gives effect "to every word, phrase, and clause" as far as possible.[22]

As stated, the public-building exception only applies to claims of failure to repair or maintain a public building, not to design defects.[23] In *Renny v Dep't of Transp*, the plaintiff was injured when she slipped and fell on a patch of ice and snow on the sidewalk of a rest area that defendant Michigan Department of Transportation (MDOT) operated.[24] The plaintiff brought suit against MDOT, claiming that MDOT's "failure to install and maintain gutters and downspouts around the roof of the building" caused melted snow and ice to accumulate on the entryway.[25] Originally, the rest stop had a "gutter" system that was integrated into the roof of the rest stop.[26] The design was explained as follows:

---

[19] *Id.* at 365.

[20] *Id.* at 365-366.

[21] *In re MKK*, 286 Mich App 546, 556-557; 781 NW2d 132 (2009).

[22] *Libbett*, 251 Mich App at 366 (citations and quotation marks omitted).

[23] *Renny*, 478 Mich at 506-507.

[24] *Id.* at 493.

[25] *Id.* at 494.

[26] *Renny v Dep't of Transp (After Remand)*, unpublished opinion per curiam of the Court of Appeals, issued September 29, 2009 (Docket No. 285039) (*Renny II*), p 1.

In contrast to a system using the more usual freestanding gutter attached to the edge of the roof, the "gutter" portion of the rest stop as it was initially designed in 1975 was part of the roof itself, the slope of which had been upturned by the use of an "outrigger" to form what appears to be a normal roof with a channel in the end of it, which drained into integral "downspouts."[27]

Sometime before the plaintiff was injured, the roof structure had been deconstructed to remove the gutters and downspouts because of a supposed malfunction of the gutter system.[28]

In holding that the public-building exception does not permit claims of design defects in public buildings, the Michigan Supreme Court explained the distinction between design defects and a failure to repair or maintain as follows:

The first sentence of MCL 691.1406 states that "[g]overnmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public." This sentence unequivocally establishes the duty of a governmental agency to "repair and maintain" public buildings. Neither the term "repair" nor the term "maintain," which we construe according to their common usage, encompasses a duty to design or redesign the public building in a particular manner. "Design" is defined as "to conceive; invent; contrive." By contrast, "repair" means "to restore to sound condition after damage or injury." Similarly, "maintain" means "to keep up" or "to preserve." Central to the definitions of "repair" and "maintain" is the notion of restoring or returning something, in this case a public building, to a prior state or condition. "Design" refers to the initial conception of the building, rather than its restoration. "Design" and "repair and maintain," then, are unmistakably disparate concepts, and the Legislature's sole use of

_____

[27] Id. at 1-2.

[28] Id. at 2.

"repair and maintain" unambiguously indicates that it did not intend to include design defect claims within the scope of the public building exception.[29]

Although it announced this distinction between "design" and "repair and maintenance," the *Renny* Court did not explain where the line between the two concepts should be drawn. Instead, the Supreme Court remanded for the Court of Claims to determine whether the plaintiff had a claim for failure to repair and maintain the building.[30]

On appeal from the Court of Claims' decision, this Court appeared to recognize that despite some of the language used in the Supreme Court's opinion, a public building could be "redesigned."[31] This Court then concluded that MDOT's removal of the gutter system was a redesign because it was an alteration of the roof structure itself and not simply a removal of the gutters.[32] In holding that this alteration was a redesign, this Court stated:

> [T]he type and extent of the change that occurred to the roof fell outside even an expansive definition of repair or maintenance, given that a portion of the roof was essen-

---

[29] *Renny*, 478 Mich at 500-501 (emphasis added).

[30] *Id.* at 507. *Renny* does not make abundantly clear whether "repair"—a restorative concept—and "maintain"—a preservative concept—are two separate concepts or rather are synonyms that refer to the "notion of restoring or returning something . . . to a prior state or condition." *Renny*, 478 Mich at 501. However, because "repair" and "maintain" occur within the same sentence of MCL 691.1406, they refer to distinct concepts. See *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002) ("Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory."). Therefore, under *Renny*, a defendant may be liable for failure to repair or failure to maintain a public building.

[31] *Renny II*, unpub op at 5.

[32] *Id.*

tially deconstructed in order to remove the outriggers and integrated downspouts. This is not . . . a case where a simple gutter was either removed, or fell down and was not replaced.[33]

"Admittedly," this Court observed, "a situation could arise where it would be difficult to distinguish between an act of repair or maintenance of an old design and a 'redesign' that would cause a defect in the new structure to fall into the category of a design defect."[34]

One additional unpublished, post-*Renny* case recognized that redesigns are exempt from the public-building exception.[35] However, it also failed to address exactly what constitutes a redesign.[36] In *Collins v Oakland Co Community College*, the plaintiff was injured when she was sliding her chair across the defendant's dental lab, which was open to the public. Her chair hit a floor-mounted electrical plate that protruded from the lab floor.[37] This electrical socket was not part

---

[33] *Id.*

[34] *Id.*

[35] *Collins v Oakland Co Community College*, unpublished opinion per curiam of the Court of Appeals, issued March 26, 2009 (Docket No. 282351).

[36] *Id.* at 2-3. A majority of the unpublished, post-*Renny* cases involved initial designs. See, e.g., *Hetherington v Univ of Mich Regents*, unpublished opinion per curiam of the Court of Appeals, issued March 17, 2009 (Docket No. 283543) (holding that the height of steps and risers and lack of accompanying guardrails were design defects); *Martin v Detroit*, unpublished opinion per curiam of the Court of Appeals, issued February 28, 2008 (Docket No. 275893) (finding a design defect in absence of gutter on roof that caused ice to accumulate on sidewalk). But see *Mack v Troy City Sch Bd of Ed*, unpublished opinion per curiam of the Court of Appeals, issued August 14, 2008 (Docket No. 278406) (explaining that auditorium's burnt-out or dim aisle lights could be a failure to repair or maintain); *Joseph v Southfield Pub Sch*, unpublished opinion per curiam of the Court of Appeals, issued May 8, 2008 (Docket No. 275869) (holding that an initial installation or construction of a drinking fountain did not constitute a design defect).

[37] *Collins*, unpub op at 1.

of the original blueprints but apparently was part of a subsequent modification.[38] Without elaboration on why this constituted a redesign, this Court concluded:

> Plaintiff argues that "[o]ne cannot characterize a feature of a building as a 'design' issue when it was not present when the building was first constructed." However, plaintiff offers no authority for this proposition. . . . Nonetheless, we note that our Supreme Court in *Renny*, rejected the notion advanced by plaintiff. The *Renny* Court stated that "[n]either the term 'repair' nor the term 'maintain,' . . . encompasses a duty to design *or redesign the public building in a particular manner.*" (Emphasis added.) Thus, the fact that the electrical socket here at issue was not part of this building's original design does not mean that plaintiff's complaint about the location of this properly functioning electrical socket is the result of defendant's failure to properly repair or maintain this building.[39]

A design defect would appear to consist of a dangerous condition inherent in the design itself, such as its characteristics, functioning, and purpose.[40] For example, the accumulation of the snow and ice on the sidewalk in *Renny* was not from any malfunction of the roof or problem with its construction, but was a natural effect of the characteristics of the new roof design, which was not intended to divert melting snow and ice.[41]

In contrast, a failure to repair or maintain appears to consist of something caused by extrinsic circumstances, such as a malfunction, deterioration, instability, or a fixture that is improperly secured or otherwise improp-

---

[38] *Id.* at 1-2.

[39] *Id.* at 3.

[40] See *Renny*, 478 Mich 501 (" 'Design' refers to the initial conception of the building . . . ."); see also *Renny II*, unpub op at 5.

[41] *Renny II*, unpub op at 5.

erly constructed or installed.[42] Reparative or preventative measures may also supplement the existing structure to preserve the existing design.[43] An action could initially be a design decision, but subsequent improper installation, malfunction, deterioration, or instability could later transform this decision into a failure to repair or maintain.[44] For example, if the wiring for the electrical socket in *Collins* became compromised and began electrocuting people through normal use, then a failure to correct the problem would be a failure to repair or maintain. But tripping over the surface because of its placement is the characteristic of the design itself, and the placement would properly be a design decision.

In this case, plaintiffs were not injured because of an inherent characteristic of the I-beam configuration when coupled with the roof overhang, such as its displacement of melting snow or ice,[45] or the fact that its base protruded into the walkway causing patrons to trip.[46] Thus, this case is distinguishable from *Renny* because the initial conception of the building's structure did not change as it did in that case; rather, the Townships introduced additional support to "keep up"

[42] See *Renny*, 478 Mich at 500-501; see also *Nowak Estate v Bay Co*, unpublished opinion per curiam of the Court of Appeals, issued July 17, 2008 (Docket No. 279076) (finding a failure to repair or maintain because of deterioration and cracking of concrete steps that caused the plaintiff to trip); *Joseph v Southfield Pub Schs*, unpublished opinion per curiam of the Court of Appeals, issued May 8, 2008 (Docket No. 275869), p 4 (noting that the initial installation or construction of a drinking fountain was not alleged to, and did not, constitute a design defect).

[43] See *Renny*, 478 Mich at 500-501.

[44] See *id.* at 501 (stating that a " 'dangerous or defective condition of a public building' arises out of the governmental agency's failure to repair and maintain that building").

[45] See *Renny II*, unpub op at 5.

[46] See *Collins*, unpub op at 3.

and "preserve" the existing roof overhang structure. In *Renny*, the roof was deconstructed to accommodate the removal of the gutter system.[47] Unlike the roof in *Renny*, the actual structure of the roof overhang in this case was never altered or modified, and even after the I-beam configuration collapsed, the existing roof overhang remained fully functional and intact. Therefore, the installation of the I-beam configuration was a preventive measure to supplement and coincide with the existing structure rather than a redesign of the roof overhang. Any defective condition was not from the I-beam's inherent characteristics but from the Townships' failure to properly maintain the stability of this I-beam configuration.

Apart from the initial placement of the I-beam configuration, once it was installed, the Townships had a continuing duty to repair and maintain it if it became loose, damaged, or unstable.[48] This case is thus further distinguishable from *Renny* because the only way to remedy the situation in *Renny* was to install a new gutter system.[49] In contrast, the Townships could have remedied the condition at issue here had they performed regular maintenance to test the stability of the I-beam structure, which would likely have disclosed any instability. This failure to repair or maintain is further illustrated by the fact that the Townships had knowledge that this I-beam configuration was not secured. Therefore, we conclude that the trial court did not err when it characterized plaintiffs' injuries as resulting from a failure to repair or maintain the building.

---

[47] *Renny II*, unpub op at 5.

[48] *Renny*, 478 Mich op at 501.

[49] See *Renny II*, unpub op at 5.

D. OPEN FOR USE BY THE PUBLIC

The Townships also argue that the trial court erred when it held that the Learning Center was open to the public at the time of the incident. The incident occurred around 8:00 p.m. when the Learning Center was closed to the public, and the Townships argue that merely making a drop box available for after-hours book returns does not make the building "open for use" by the public. Additionally, according to the Townships, the Learning Center limited the public's access to the drop box by posting a "No Loitering" sign outside the building.

In determining whether a public building is open for use by the public, we must consider the nature of the building, the building's use, and any limiting criteria on the public's right to access.[50] In *Kerbersky v Northern Mich Univ*, the Michigan Supreme Court held that the building at issue, which was part of a public university, was open for use by the public despite the fact that the area where the plaintiff was injured was not open to the general public.[51] The Court found it significant that the building remained open to the public during renovations.[52] However, the Court agreed with previous cases holding that if an entire building is closed while renovations are being performed, it is not considered open to

---

[50] *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 618; 664 NW2d 165 (2003); see also *Brown v Genesee Co Bd of Comm'rs (After Remand)*, 464 Mich 430, 435; 628 NW2d 471 (2001) ("When determining the public's access, we analyze the building itself, *not* the specific accident site within the building.") (opinion by CORRIGAN, C.J.).

[51] *Kerbersky*, 458 Mich at 527, 536; see also *Maskery*, 468 Mich at 619 n 9 ("*Kerbersky* clarifies that a building may be 'open for use by members of the public' even where a location within the building is restricted from public use."); *Brown*, 464 Mich at 436 (opinion by CORRIGAN, C.J.) (stating that the public-building exception applies even though the public may not enter "whenever and wherever they please").

[52] *Kerbersky*, 458 Mich at 536.

the public for purposes of the public-building exception.[53]

In contrast, in *Maskery v Univ of Mich Bd of Regents*, the Supreme Court concluded that a public university dormitory was not open for use by the public because it was locked 24 hours a day, and only residents or visitors that were permitted access from a resident were allowed admittance.[54] Albeit arguably in dictum, the *Maskery* Court explained:

> [T]he statutory language makes clear that the public-building exception applies *when* the building is open for use by members of the public. A building such as a courthouse that is open to the public during business hours may nonetheless be *closed* to the public at other times, such as at night or on weekends. Similarly, a university athletic facility may be open to the public during a sporting event, but closed to the public at other times. Because the statutory language limits the exception to periods *when* the building is open for use by members of the public, accidents that occur when the building is closed to the public do not fall within the confines of the exception, and the government is entitled to immunity.[55]

The Learning Center in this case is more like the university building in *Kerbersky* than the building in *Maskery* because the exterior area where the incident occurred was open to the public, even though the interior of the Learning Center itself was closed when the incident occurred.[56] As the Court explained in *Maskery*,

> The phrase "limited access" was used in *Kerbersky* to explain that where access *to part of a building* is limited,

---

[53] *Id.* at 535.

[54] *Maskery*, 468 Mich at 611.

[55] *Id.* at 619.

[56] See *Kerbersky*, 458 Mich at 535-536; *Brown*, 464 Mich at 435.

the public-building exception may still apply if the building remains open for use by members of the public. Here, the concept of limited access is used in a different sense, i.e., to describe a building in which access *to the entire building*, or the general right of entry, is restricted to persons who are qualified to enter. Where the government has created rules that render the building closed except to those who are qualified to enter, the building is not open for use by members of the public. The focus of the test is on the government's intended use of the building. Thus, the test set forth in this case should not be confused with the language in *Kerbersky* clarifying that a building may be open to the public even though access to a part of the building is limited.[57]

In keeping with *Kerbersky*, if even a part of a building remains open to the public, then the building falls within the public-building exception. The focus is on the intended use of the building and not merely on the hours of operation. In this case, at no point was the entire Learning Center continuously closed to the public. At any time of the day the public was freely permitted to access the area under the roof overhang where the I-beam configuration was located to use the drop box. Admittedly, plaintiffs were not under the roof overhang area to return books; however, unlike in *Maskery*, defendants had instituted no method of limiting the public's access to the roof overhang area. And although there was a "No Loitering" sign, which purported to limit access to the area, plaintiffs were not "loitering" as that term in commonly defined. "Loiter" means "to linger aimlessly . . . in or about a place" or "to waste time . . . ."[58] Rather, plaintiffs were under the roof overhang area with the purpose of waiting for their parents to pick them up. Accordingly, we conclude that

---

[57] *Maskery*, 468 Mich at 618 n 9.

[58] *Random House Webster's College Dictionary* (1997), p 774.

plaintiffs presented sufficient evidence to show that the Learning Center was open to the public at the time of the incident.

### E. NOTICE

Defendants further argue that the trial court erred when it found that they had notice of the defective condition because a volunteer's opinion is insufficient to put defendants on notice of a defect. Also, defendants contend, the notice was not constructive because this structure had remained in place without incident for three years.

This Court has held that knowledge of a condition may be satisfied by either actual or constructive knowledge.[59] The public-building exception presumes knowledge by a government agency if "such defect existed so as to be readily apparent to an ordinary observant person for a period of 90 days or longer before the injury took place."[60] The main thrust of the Townships' argument is basically that they never inspected the structure and thus never had knowledge of the condition. However, the Townships received actual notice of the fact that this I-beam configuration was not properly secured when Erdmann informed McNeil that it was loose or might be able to move. There is some dispute regarding how detailed Erdmann's critique of the stability of the I-beam configuration was, yet McNeil admitted that Erdmann did warn her about its possible instability. Therefore, we conclude the trial court did not err when it concluded that the Townships had sufficient notice of the defective condition.

---

[59] *Ali v Detroit*, 218 Mich App 581, 586-587; 554 NW2d 384 (1996).
[60] MCL 691.1406.

IV. CONCLUSION

The trial court did not err when it concluded that plaintiffs' injuries from the I-beam configuration arose from a failure to repair or maintain and not a design defect. The trial court also did not err by concluding that the Learning Center was open for use by the public. And the trial court did not err when it concluded that the Townships had sufficient notice of the defective condition. Accordingly, the trial court properly denied defendants' motion for summary disposition under MCR 2.116(C)(7).

We affirm.