# STATE OF MICHIGAN

# COURT OF APPEALS

SHERRY WILLIAMS, as Next Friend for
VICTORIA WILLIAMS, a Minor,

UNPUBLISHED
June 30, 2015

Plaintiff-Appellant,

v

No. 321261
Eaton Circuit Court
LC No. 13-000163-NO

GRAND LEDGE HIGH SCHOOL and GRAND
LEDGE PUBLIC SCHOOLS,

Defendants-Appellees.

Before: RIORDAN, P.J., and DONOFRIO and BECKERING, JJ.

PER CURIAM.

In this personal injury action arising out of a fall that occurred in a high school, plaintiff, Sherry Williams, as next of friend for her daughter, Victoria Williams,[1] a minor, appeals by right the trial court's order granting summary disposition to defendants, Grand Ledge High School and Grand Ledge Public Schools, based on governmental immunity. The trial court's order also denied plaintiff's motion for leave to amend her complaint to add a claim for gross negligence against Grand Ledge High School principal Steven Gabriel. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On or about October 10, 2011, Victoria was a 14-year-old freshman at Grand Ledge High School. During choir class, Victoria sat in the back row of chairs situated on the top level of platform risers located in the middle of the choir room. At the time of the accident, the back ledge of the upper riser was equipped with a two-inch "lip," presumably to stop chairs from sliding off. The risers were otherwise freestanding, with no guardrails. Victoria and her classmates rose to their feet to participate in warm-up exercises. After approximately five

---

[1] This opinion will refer to Sherry as "plaintiff" and will refer to Victoria by first name.

-1-

minutes, Victoria and her classmates sat down, at the direction of Sheri Tulloch, the choir teacher. When Victoria sat down, her chair fell backward off the risers, causing her to fall.[2]

On February 4, 2013, plaintiff filed a complaint and named Grand Ledge High School and Grand Ledge Public School as defendants responsible for Victoria's injuries arising out of the incident. The complaint alleges that Victoria injured her head and back in the fall when she hit a "set piece" from a play that had been stored behind the risers. Plaintiff contended that defendants were negligent for failing to maintain and repair a public building in contravention of MCL 691.1406, due to the lack of a guardrail on the back of the riser.

The horseshoe-shaped risers are over 32 feet long, 16 feet wide, and 2 feet tall. Each of the three levels of the risers is approximately 3 feet deep. Comprised of various sections that are bolted and clamped together, they were installed in the choir room in approximately 1995 or 1996, when additions were made to the school. The risers are not bolted to the floor. Ronald Hicks, a custodian at the high school, testified in his deposition that the risers had been disassembled two or three times, but they had never been moved from the choir room. Hicks also testified that maintenance staff moved the risers, albeit infrequently, within the choir room when they refinished the floor. The risers are large, so in order to move them, maintenance staff dampened the floor around the risers by mopping it, and then slid the risers. Dale Harlow, another custodian, testified that he had never taken apart the risers during his employment. He recalled that he had occasionally been asked to readjust clamps that held the sections together and to tighten the connections between the sections. He had never observed the risers separated into individual sections, and, as far as he knew, the risers remained in the same spot in the choir room.

Tulloch, the choir director, testified in her deposition that she had observed three other students fall from the risers in the three years prior to the fall in question, at least two of whom fell off the back. The record does not contain evidence as to the cause of those falls.[3] None of the other students who fell were injured, although one suffered some bruising. In "the spring before [Victoria] fell," Tulloch testified that she made a request for a railing on along the back row of the risers. She was unsure "how many times" she requested railings, or if she made any other requests for railings. In his deposition, Gabriel recalled receiving an email from Tulluch regarding getting railings after a student had fallen. The record only reveals that Gabriel was aware of one student falling prior to the incident involving Victoria. Gabriel testified that in response to the request, he told Tulloch that they should "[l]ook at what the options are and [to] let [him] know what's out there, and we can go from there."

---

[2] Although Victoria testified in her deposition that her chair fell backward because "one leg was off the edge of the riser," causing her to fall when she sat down, she also testified that she does not actually remember actually falling, and that she was told what happened by others. Her last memory was when she was walking up the risers before warm-up exercises.

[3] The record contains only excerpts of the deposition transcripts in this matter.

On September 20, 2011, before Victoria's fall, Tulloch sent an e-mail to Gabriel and school superintendant, Dr. Brian Metcalf, among others. Therein, Tulloch addressed some general concerns about her choir room and she raised an issue with regard to the risers. Tulloch did not mention the lack of a railing, but requested that the risers be "realigned and secured" because the "kids hate sitting in certain areas for fear that their chair is going to slip in the cracks." Gabriel replied to the e-mail the same day, noting that, in his opinion, the "bigger safety issue" with the risers was the lack of a railing at the top tier. Gabriel mentioned that he had discussed the issue with Tulloch before, and that she had promised to give him an estimate of how much it would cost to install the railing. Gabriel's response provides, in pertinent part:

> As for the risers, I will have the custodial/maintenance crew look into the needed adjustments. As you and I discussed, the bigger safety issue is the lack of a railing al[ong the] top tier. You were going to get a quote for a railing system to me. Please do so. I would like to get that taken care of asap.

Gabriel testified in his deposition that he raised the issue of the railing because another student had previously fallen; at the time of his deposition, he did not recall the year that the other student had fallen.

After receiving Gabriel's reply, Metcalf sent Gabriel an e-mail asking "[a]re the risers a safety concern that would warrant a directive from you that they should not be used until the railing is installed?" The record does not contain a response from Gabriel. However, the e-mail chain contains a response from Metcalf to Gabriel in which Metcalf simply replied "Thanks Steve!!" The same day Gabriel asked for a price quote, Tulloch forwarded to him a customer quotation from Wenger Corporation for the purchase of guardrails.

Shortly after Victoria's fall, defendants installed guardrails on the back of the risers. An invoice from Wenger Corporation shows that the guardrails were ordered on October 11, 2011, and shipped on October 13, 2011. According to Gabriel's deposition testimony, a "request" for the railings "had been put in just a week or two prior to the accident" involving Victoria.

Following discovery, defendants moved for summary disposition, contending that they were entitled to governmental immunity. They argued that plaintiff could not maintain a claim under MCL 691.1406, the public-building exception, because the risers were not fixtures, and because any claim by plaintiff amounted to a design-defect claim, which was not actionable under the exception. Plaintiff responded, arguing that her claim was viable under the public-building exception. She also sought leave to amend her complaint to add a claim against Gabriel for gross negligence.

The trial court granted summary disposition to defendants, finding that the risers did not constitute fixtures; thus, they were not "of a public building." In addition, the trial court found that even if the risers were fixtures, plaintiff's complaint alleged a design defect, not a failure to maintain or repair, meaning that her claim was not actionable under the public-building exception. Finally, the trial court denied plaintiff's motion for leave to amend her complaint, finding that the facts did not support a claim for gross negligence, and that amendment would be futile.

## II. SUMMARY DISPOSITION

We review de novo the trial court's grant of summary disposition. *Henderson v Dep't of Treasury*, 307 Mich App 1, 8; 858 NW2d 733 (2014). "A defendant is entitled to summary disposition under MCR 2.116(C)(7) if the plaintiff's claims are barred because of immunity granted by law." *Pew v Mich State Univ*, 307 Mich App 328, 331-332; 859 NW2d 246 (2014). Defendants, as the moving parties, bore the burden to support their motion for summary disposition with affidavits, depositions, and other documentary evidence. *Id.* at 332, citing MCR 2.116(G)(5), (6). "To survive a (C)(7) motion based on governmental immunity, a plaintiff must allege facts justifying the application of an exception to governmental immunity. In reviewing a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party." *Tellin v Forsyth Twp*, 291 Mich App 692, 698; 806 NW2d 359 (2011) (citation and quotation marks omitted). "If reasonable minds could not differ on the legal effects of the facts, whether governmental immunity bars a plaintiff's claim is a question of law." *Pew*, 307 Mich App at 332.

## A. GOVERNMENTAL IMMUNITY

There is no dispute that defendants are governmental agencies. "Generally, the governmental immunity act provides broad immunity from tort liability to governmental agencies, officials, or employees who exercise or discharge a governmental function." *Pew*, 307 Mich App at 332. See also MCL 691.1407(1). The operation of a public school is a governmental function." *Stringwell v Ann Arbor Pub Sch Dist*, 262 Mich App 709, 712; 686 NW2d 825 (2004). Therefore, defendants are entitled to governmental immunity, unless an exception applies.

We strictly construe exceptions to the Governmental Tort Liability Act (GTLA). *Tellin*, 291 Mich App at 699. Plaintiff alleges that MCL 691.1406, the public-building exception, applies in this case and allows her to pursue a claim against defendants. In order to bring suit under the public-building exception, a plaintiff must establish:

> (1) a governmental agency is involved, (2) the public building in question is open for use by members of the public, (3) a dangerous or defective condition of the public building itself exists, (4) the governmental agency had actual or constructive knowledge of the alleged defect, and (5) the governmental agency failed to remedy the alleged defective condition after a reasonable amount of time. [*Renny v Dep't of Transp*, 478 Mich 490, 496; 734 NW2d 518 (2007).]

The parties only dispute two aspects of the public-building exception: (1) whether the risers were a condition "of the public building itself," i.e., whether they could be considered fixtures; and (2) whether defendants failed to maintain or repair a dangerous condition, such that plaintiff's claim would be actionable, or whether the dangerous condition alleged was a design defect in the risers, such that plaintiff's claim would not be actionable.

## B. WHETHER THE RISERS WERE FIXTURES

To establish the applicability of the public-building exception, "the alleged defect must be a defect of the building itself and not merely a transient condition . . . ." *Johnson v. City of Detroit*, 457 Mich 695, 703-704; 579 NW2d 895 (1998) (citation omitted). Fixtures attached to the public building are considered to be "of the building itself" and can support a claim under the public-building exception. *Fane v Detroit Library Comm*, 465 Mch 68, 77; 631 NW2d 678 (2001). "Fixtures are considered part of a public building if: (1) they are annexed to the realty, whether the annexation is actual or constructive, (2) their adaptation or application to the realty being used is appropriate, and (3) there is an intention to make the articles a permanent accession to the realty." *Carmack v Macomb Co Community College*, 199 Mich App 544, 547; 502 NW2d 746 (1993). "The controlling intention regarding whether an object has become a fixture of the realty is manifested by the objective, visible facts." *Id.* (citation and quotation marks omitted). Annexation to the realty may be actual, meaning that the item is permanently affixed to the building in some fashion, or constructive. *Fane*, 454 Mich at 79-80. "Constructive annexation occurs where the item cannot be removed from the building without impairing the value of both the item and the building." *Id.* at 80.

Accepting as true all well-pleaded allegations in plaintiff's complaint and construing them in her favor, we find the trial court erred when it determined that the choir risers were not fixtures. While it is undisputed that the risers were not actually attached to the floor, the objective, visible facts show that the controlling intention was that the risers were to be fixtures. See *Carmack*, 199 Mich App at 547. The risers' size, permanence to the choir room, and function are revealing in that regard. Concerning the risers' size, and as noted above, they were over 32 feet long, 16 feet wide, and 2 feet high. It is axiomatic that an item of such size would not be easily moveable. And, in this case, the risers were, for an overwhelming majority of their 15-year existence, stationary. Even when they were moved, they were only moved within the choir room and the infrequent moves were only accomplished through significant effort, i.e., wetting/lubricating the floor and requiring three individuals to push them along the wet surface. This is in significant contrast to nonstationary items such as library chairs, ping-pong tables, and mattresses, which our Courts have rejected as being fixtures. See *Velmer v Baraga Area Sch*, 430 Mich 385, 396; 424 NW2d 770 (1988) (examining various cases and contemplating that a milling machine in a high school shop classroom could be constructively attached to the building by its weight); Cf. *Carmack*, 199 Mich App at 547 (finding that gymnastic equipment was not a fixture when it was "easily removable and was removed on an almost daily basis"). Rather, the record evidence, when viewed in a light most favorable to plaintiff, demonstrates that the risers functioned as a permanent fixture of the choir room, and that they were not intended to be removed. See *Velmer*, 430 Mich at 394, 396 (opining that the sheer size and weight of an item could make it a fixture for purposes of the public-building exception). Removing such a large item from the choir room would have impaired both the value of the building and the risers. See *Fane*, 454 Mich at 80. The risers would have been largely useless apart from the building, given

-5-

their size and function, and the building—in particular, the choir room—would not have had the same utility as it had when the risers were installed therein. As such, the risers were constructively annexed to the public building. See *Caron v Cranbrook Ed Community*, 298 Mich App 629, 632, 644; 828 NW2d 99 (2012) (finding, albeit for purposes of MCL 600.5839,[4] that a "T-shaped, three-part portable room partition" that sat on wheels in an art classroom was "constructively annexed" to the classroom, given the size and permanent location of the partition in the art classroom).

## C. DUTY TO MAINTAIN OR REPAIR

The remaining inquiry concerns whether this case involved a failure to repair or maintain the risers, or whether it involved a claim for a defect in the design of the risers—the installed fixture. The public-building exception imposes on governmental agencies a duty to repair and maintain public buildings under their control when those buildings are open to the public; the exception does not impose liability for a design defect. *Renny*, 478 Mich at 505. Before our Supreme Court's decision in *Renny*, the issue of whether a design defect gave rise to liability under the public-building exception caused our courts "considerable difficulty." *Id.* at 499 (citation and quotation omitted). In *Renny*, our Supreme Court examined the plain language of MCL 691.1406. The statute provides, in part, that "[g]overnmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public." MCL 691.1406. As noted in *Renny*, 478 Mich at 500, "[t]his sentence unequivocally establishes the duty of a governmental agency to "repair and maintain" public buildings." The Court in *Renny* explained that the plain and ordinary meaning of the terms "repair and maintain" did not encompass a duty to design or redesign a public building in a particular manner. *Id.*

> "Design" is defined as to conceive; invent; contrive. By contrast, "repair" means to restore to sound condition after damage or injury. Similarly, "maintain" means to keep up or to preserve. Central to the definitions of "repair" and "maintain" is the notion of restoring or returning something, in this case a public building, to a prior state or condition. "Design" refers to the initial conception of the building, rather than its restoration. "Design" and "repair and maintain," then, are unmistakably disparate concepts, and the Legislature's sole use of "repair and maintain" unambiguously indicates that it did not intend to include design defect claims within the scope of the public building exception. [*Id.* at 500-501 (citations and quotation marks omitted).]

---

[4] MCL 600.5839 concerns actions against architects and other professionals "arising out of the defective or unsafe condition *of an improvement to real property* . . . ." (Emphasis added).

"Therefore, to avoid governmental immunity, a plaintiff must assert a claim that the defective condition was the result of a failure to repair or maintain." *Tellin*, 291 Mich App at 700.

In *Tellin*, this Court undertook the task of explaining the difference between "design defects" and "repair and maintenance," noting that "the *Renny* Court did not explain where the line between the two concepts should be drawn." *Id.* at 703. With regard to that line, this Court explained:

> A design defect would appear to consist of a dangerous condition inherent in the design itself, such as its characteristics, functioning, and purpose. . . .
>
> In contrast, a failure to repair or maintain appears to consist of something caused by extrinsic circumstances, such as a malfunction, deterioration, instability, or a fixture that is improperly secured or otherwise improperly constructed or installed. Reparative or preventative measures may also supplement the existing structure to preserve the existing design. An action could initially be a design decision, but subsequent improper installation, malfunction, deterioration, or instability could later transform this decision into a failure to repair or maintain. [*Id.* at 705-706.]

As an example of an action that initially began as a design decision, but subsequently became an improper installation, the panel in *Tellin* examined the facts of *Collins v Oakland Co Comm College*, unpublished opinion per curiam of the Court of Appeals, issued March 26, 2009 (Docket No. 282351), a case where the plaintiff alleged that the placement of an electrical socket on the floor caused her to fall. See *id.* at 706. In *Collins*, unpub op at 3, this Court held that plaintiff's claim "amounts to nothing more than the assertion that the electrical socket was not properly located within [the building.] This is a claim of design defect." In *Tellin*, 291 Mich App at 706, this Court provided the following example of a failure to maintain or repair versus a design defect, using the factual scenario of *Collins* as an illustration:

> For example, if the wiring for the electrical socket in *Collins* became compromised and began electrocuting people through normal use, then a failure to correct the problem would be a failure to repair or maintain. But tripping over the surface because of its placement is the characteristic of the design itself, and the placement would properly be a design decision.

An in-depth examination of the facts in *Tellin* is instructive in this case, given that the parties cite the case extensively. In *Tellin*, the plaintiffs alleged that they were injured when an I-beam that was designed to support the roof overhang of "the Learning Center," a government building in Forsyth Township, came loose and fell on them. *Id.* at 693-694. The roof overhang had traditionally been supported by wooden columns, but the defendants in that case later decided to add a steel I-beam configuration to the roof overhang in order to support the existing columns. *Id.* at 694-695. After the I-beam was installed, defendants received notice that it may have become loose. *Id.* at 695-696. Despite this notice, defendants did not take any action. *Id.* at 696. Thereafter, the plaintiffs were injured after the I-beam became loose and fell on them. *Id.*

This Court found that the plaintiffs' injuries arose from the failure to maintain or repair the I-beam, and not from a design defect. *Id.* at 706-707. This Court concluded that "plaintiffs were not injured because of an inherent characteristic of the I-beam configuration when coupled with the roof overhang, such as its displacement of melting snow or ice, or the fact that its base protruded into the walkway causing patrons to trip." *Id.* at 706. The panel explained that because the I-beam was placed to "keep up" and "preserve" the Learning Center's existing roof overhang structure, the installation of the I-beam was a preventive measure, rather than a redesign of the roof. *Id.* at 706-707. As such, "[a]ny defective condition was not from the I-beam's inherent characteristics but from the [defendants'] failure to properly maintain the stability of this I-beam configuration." *Id.* at 707.

Turning to the instant case, in light of existing case law, we find that plaintiff's complaint alleged a design defect in the risers, rather than a failure to maintain and/or repair the risers. Plaintiff has not alleged any facts suggesting that defendants failed to maintain or repair—that is, restore to sound condition or keep up or preserve—the risers with regard to the presence of railings. See *Renny*, 478 Mich at 500-501. For example, there is no evidence that guardrails were ever installed on the risers and were subsequently damaged or removed, which would lead to a situation of failure to maintain and repair. The crux of plaintiff's complaint alleged that the risers were defective or dangerous because they did not have a guardrail along the back of the top tier. All they had was a two-inch lip in that location. This sounds more in the nature of a claim that the *design* of the risers was defective. See *id.* at 501 (explaining that the word "design" "refers to the initial concept of the building . . . ."). The complaint does not allege that defendants failed to restore the risers "to sound condition after damage or injury" or that they failed to "keep up" or "preserve" the risers. See *id.* at 500-501. In *Tellin*, 291 Mich App at 705, this Court stated that "a failure to repair or maintain appears to consist of something caused by *extrinsic circumstances . . . .*" (Emphasis added). Here, there was nothing extrinsic alleged by plaintiff; rather, plaintiff alleged that the harm was caused by a lack of railings on the risers. This is a claim of an inherent problem with the risers as conceived and constructed, rather than extrinsic circumstances, such as, for example, a railing that became loose or unstable. See *id.* The harm alleged "was a natural effect of the characteristics" of the risers' design, which would be akin to a claim for design defect, not a failure to maintain or repair. See *id.*

We note that in *Tellin*, this Court stated that a design or repair claim could arise from, among others, "a fixture that is improperly secured or otherwise improperly *constructed or installed.*" *Id.* at 705-706 (emphasis added). In this case, the argument could be made that the risers are a fixture, and that their installation in the middle of the choir room (as compared to the back wall), with no back guardrail, was improper. However, in *Tellin*, this Court rejected this type of installation claim, distinguishing it from a failure to maintain or repair. In *Tellin*, this Court used the electrical socket from *Collins* as an example. *Id.* at 706. In *Collins*, the plaintiff tripped over an electrical socket on the floor. If the wiring in that electrical socket became compromised, the failure to correct the problem, reasoned the panel in *Tellin*, would be a failure to maintain or repair. *Id.* "But tripping over the surface *because of its placement is the characteristic of the design itself, and the placement would properly be a design decision.*" *Id.* (Emphasis added). Turning back to the instant case, any claim that the placement of the risers in the middle of the choir room without any sort of back guardrail is not the type of improper installation claim that could give rise to a claim for liability under the rationale provided in *Tellin*. See *id.* at 705-706.

-8-

Plaintiff contends that defendants were aware, given Tulloch's deposition testimony, that three students had fallen before Victoria fell, that the risers were dangerous, and that defendants' knowledge of the dangerous condition turned this action into a failure to maintain or repair. She argues that *Tellin* supports this position. Plaintiff's position strains the holding in *Tellin*. In *Tellin*, 291 Mich App at 707, this Court concluded that aside from the initial placement of the I-beam, the defendants in that case "had a continuing duty to repair and maintain it if it became loose, damaged, or unstable." In contrast to remedying the situation by installing something new—which we suggested would not be a maintenance or repair issue—this Court stressed that the defendants "could have remedied the condition at issue here had they performed regular maintenance to test the stability of the I-beam structure, which would likely have disclosed any instability." *Id.* The panel continued, "[t]his failure to repair or maintain is further illustrated by the fact that the [defendants] had knowledge that this I-beam configuration was not secured." *Id.* Plaintiff's argument misconstrues this Court's holding in *Tellin*. In *Tellin*, this Court did not suggest that the defendants' knowledge of the dangerous condition made the plaintiff's claim one involving a failure to maintain or repair. Rather, the case involved a failure to maintain or repair because the I-beam *became loose* and that condition was not remedied. *Id.* In other words, defendants did not restore the I-beam to a sound condition after it became loose. The case does not stand for the proposition that plaintiff says it does.

Lastly, we note that plaintiff attempts to rely on our Supreme Court's decision in *Bush v Oscoda Area Sch*, 405 Mich 716, 727-728; 275 NW2d 268 (1979), a pre-*Renny* decision that was harshly criticized in *Renny*. In *Bush*, our Supreme Court ruled that the plaintiff in that case stated a claim within the ambit of "the defective building provision"—as the "public-building exception" was then known—by alleging that a classroom lacked necessary safety equipment. Assuming that a lack-of-safety-features claim exists post-*Renny*, such a claim does not change the analysis in this case. Essentially, plaintiff's claim is that the risers were dangerous because they lacked railings. Railings are generally installed as part of the construction of the thing on which they are placed. We see no significant difference—and plaintiff has not articulated a compelling distinction—between a claim for a lack of railings as safety features and a claim that the *design* of the risers was defective because it lacked railings. Plaintiff essentially seeks to hold defendants liable for a flaw in the design of the risers. Although the lack of a guardrail on the back of the risers appears to have been a significant design flaw given the number of students who fell off the risers, in light of *Renny* and similar precedent, this claim is not actionable under the public-building exception. See *Renny*, 478 Mich at 505.[5]

---

[5] Although unpublished opinions are not binding upon us, we note that in *Hetherington v University of Michigan Regents*, unpublished opinion per curiam of the Court of Appeals, issued March 17, 2009 (Docket No. 282543), this Court held that "with respect to the absence of guardrails in particular, [which in *Hetherington* also pertained to risers,] we view the claim as one alleging a design defect. Guardrails are generally included as part of the construction of a building."

### III. LEAVE TO AMEND

Finally, plaintiff argues that the trial court abused its discretion when it denied her motion for leave to amend her complaint to add a claim for gross negligence against Gabriel. We review for an abuse of discretion a circuit court's decision to grant or deny leave to amend a pleading[.]" *Boylan v Fifty Eight LLC*, 289 Mich 709, 727; 808 NW2d 277 (2010). A trial court should only deny a motion to amend a complaint for "particularized reasons," such as "the futility of amendment." *Id.* at 728. An amendment is futile if, among other reasons, "it is legally insufficient on its face . . . ." *PT Today, Inc v Comm'r of Fin & Ins Servs*, 270 Mich App 110, 143; 715 NW2d 398 (2006). Here, the trial court denied the motion for leave to amend because it found that a claim for gross negligence against Gabriel would be futile.

As the principal of a public high school, Gabriel was an employee of a governmental agency. Pursuant to the GTLA, Gabriel was entitled to governmental immunity, provided he met certain conditions.[6] In this regard, MCL 691.1407(2) provides:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:
>
> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

As noted, the trial court found that amendment would have been futile because the facts as alleged did not amount to gross negligence by Gabriel. The GTLA defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). Gross negligence refers to conduct that is "substantially more" than mere negligent conduct. *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 383; 838 NW2d 720 (2013) (citation and quotation marks omitted). Gross negligence "has

---

[6] Although not raised as an issue, this Court has held that high school principals do not qualify for executive immunity under MCL 691.1407(5). See *Eichhorn v Lamphere Sch Dist*, 166 Mich App 527, 539; 421 NW2d 230 (1988).

been characterized as a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver v Smith*, 290 Mich App 678, 685; 810 NW2d 57 (2010). "Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). Instead, gross negligence requires

> almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge. [*Id.*]

In reviewing the issue of gross negligence, we consider the totality of the circumstances. *Kieft v Barr*, 391 Mich 77, 80; 214 NW2d 838 (1974). In order to show that amendment would not have been futile, plaintiff has to show that, in the mind of an objective observer, Gabriel "simply did not care about the safety or welfare of those in his charge" and that he had a "singular disregard for substantial risks." *Tarlea*, 263 Mich App at 90.

The evidence shows that Gabriel was aware that at least one student had fallen, and, at the time he became aware of the fall, Gabriel suggested to Tulloch that they look at their options for addressing the problem with the risers. Although approximately four to six months went by before Gabriel ordered the railings, much of the time period between the request and the order was in the summer, presumably when school was not in session and when the risers were not in use. And, when Tulloch raised a different concern about the risers in September 2011, Gabriel stated that the "bigger safety issue" was the lack of a railing. Gabriel indicated he wanted to get that "bigger safety issue" "taken care of asap." Gabriel testified in his deposition that he raised the issue of the railing because another student had previously fallen. In light of this evidence, we conclude that no reasonable juror could have concluded that Gabriel demonstrated a "substantial lack of concern for whether an injury results," see MCL 691.1407(8)(a), or a "willful disregard of safety measures and a singular disregard for substantial risks," see *Oliver*, 290 Mich App at 685. Rather, Gabriel specifically acknowledged the risk on two occasions and sought to come up with ways to mitigate that risk. He even brought up the risk on his own when Tulloch brought up another issue. An objective observer, having watched Gabriel, would not conclude that he "simply did not care about the safety or welfare of those in his charge." *Tarlea*, Mich App at 90. See also *Vermilya v Dunham*, 195 Mich App 79, 83; 489 NW2d 496 (1992) (finding that a school principal was not grossly negligent in regard to the risk posed by an un-anchored soccer goal when the principal asked a maintenance supervisor to anchor the goals, checked on the maintenance supervisor's progress, made announcements at school regarding the risks involved in playing on the soccer goals, and disciplined students who did not heed those warnings). Plaintiff contends that Gabriel could have done more; she argues he could have discontinued using the risers after Metcalf suggested as much, or he could have suggested moving the back of the risers against the wall. However, allegations that Gabriel could have done more are simply that; they are not allegations that he ignored the risk. Allegations that an actor could have done more are not, on their own, enough to establish gross negligence. See

*Tarlea*, 263 Mich App at 90.  As such, amendment would be futile, and the trial court did not abuse its discretion in denying plaintiff leave to amend.  See *Boylan*, 289 Mich App at 728; *PT Today, Inc*, 270 Mich App at 143.[7]

Affirmed.

/s/ Michael J. Riordan
/s/ Pat M. Donofrio
/s/ Jane M. Beckering

---

[7] In passing, plaintiff argues that she is entitled to an adverse inference because a purported e-mail from Gabriel to Metcalf was missing.  An adverse inference permits, but does not require, the *fact-finder* to conclude that certain missing evidence would have been adverse to the opposing party.  *Brenner v Kolk*, 226 Mich App 149, 155; 573 NW2d 65 (1997).  Plaintiff does not explain how the adverse inference principle is applicable in the context of summary disposition.  Moreover, summary disposition review already requires the evidence to be viewed in a light most favorable to the non-moving party, which in this case is plaintiff.  See *Tellin*, 291 Mich App at 698.  Accordingly, it is unclear how an adverse inference, even if applicable, would affect the outcome in this case.