# STATE OF MICHIGAN

# COURT OF APPEALS

GEORGE K. TRUCHAN,

        Plaintiff-Appellee,

v

CHARTER TOWNSHIP OF ADRIAN, JIM KOEHN, and RICHARD L. GERMOND,

        Defendants-Appellants.

UNPUBLISHED
November 5, 2015

No. 323624
Lenawee Circuit Court
LC No. 12-004423-CZ

---

GEORGE K. TRUCHAN,

        Plaintiff-Appellee,

v

RICHARD L. GERMOND,

        Defendant-Appellant,

and

CHARTER TOWNSHIP OF ADRIAN and JIM KOEHN,

        Defendants.

No. 323655
Lenawee Circuit Court
LC No. 12-04423-CZ

---

Before: SAWYER, P.J., and K. F. KELLY and FORT HOOD, JJ.

PER CURIAM.

Plaintiff sued the Charter Township of Adrian (Township), Jim Koehn (Koehn), and Richard L. Germond (Germond). Against Koehn and Germond, plaintiff alleged tortious interference with an advantageous business relationship (Count I), defamation (Count II), injurious falsehood (Count III), and false light/invasion of privacy (Count IV). Against Koehn, Germond, and the Township, plaintiff alleged violations of the Bullard-Plawecki Employment Right to Know Act (ERKA), MCL 423.501 *et seq.* (Count V).

-1-

In Docket No. 323624, the Township, Koehn, and Germond, appeal by leave granted an order denying their motion for summary disposition on non-governmental immunity grounds. In Docket No. 323655, Germond appeals as of right from that same order to the extent the order denied his motion for summary disposition and rejected his claim that he was entitled to governmental immunity. We reverse.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiff served multiple roles in Adrian Township. He was first hired in 2002 as the Township Attorney and in 2008 was appointed as police chief and director of public safety. The Public Safety Advisory Committee (PSAC) served to advise the Township Board on matters related to police and fire safety. Former Lenawee County Sheriff Richard Germond served as the PSAC's chairman. On May 9, 2011, Germond gave Township Supervisor Jim Koehn a memo setting forth a variety of concerns Germond had about plaintiff's actions. Among the complaints was plaintiff's behavior at an accident investigation scene, plaintiff's use of foul language with dispatch, plaintiff's failure to attend police chief meetings, plaintiff's continued use of a township vehicle for his own personal use, and plaintiff's alleged personal relationship with a reserve officer, Melinda Schwyn.

Plaintiff met with Koehn on May 26, 2011 to discuss Germond's memo. At the meeting, Koehn and plaintiff agreed that they would meet weekly to discuss police and fire issues. Both reported that the meeting was amicable.

On May 27, 2011, Germond submitted a copy of his earlier May 9th memo to the other members of the PSAC and also included another memo with additional concerns.

Thereafter, on June 2, 2011, plaintiff submitted a letter of resignation from his position as director of public safety. A special meeting of the PSAC was scheduled for June 4, 2011 but was adjourned after plaintiff did not attend. On June 7, 2011, plaintiff notified Koehn that he had decided to retire as police chief, effective December 31, 2011. On numerous occasions, Koehn asked plaintiff to meet with Koehn and Germond to discuss the concerns raised in Germond's two memos. Plaintiff refused to meet the two men without his own witness present, prompting Koehn to fire him. Koehn testified that he fired plaintiff, not because of the allegations in the memos, but because plaintiff continuously refused to meet. On July 11, 2011 the Township Board voted 6-1 to formally terminate plaintiff.

In the meantime, on June 30, 2011, a local newspaper – the *Daily Telegram* – requested an opportunity to review plaintiff's personnel file under the Freedom of Information Act (FOIA), MCL 15.231 *et seq.* Germond's two memos were in the file and were ultimately referenced in two separate articles. A July 8, 2011, article was titled "Police chief criticized for conduct, use of car" and a July 9, 2011 article was titled "Truchan fired by Adrian Twp. board."

Plaintiff then sued the Township, Germond, and Koehn. Against Koehn and Germond, plaintiff alleged tortious interference with an advantageous business relationship (Count I), defamation (Count II), injurious falsehood (Count III), and false light/invasion of privacy (Count IV). Against Koehn, Germond, and the Township, plaintiff alleged violations of ERKA (Count V).

All defendants sought to have the complaint dismissed, arguing that they were protected by governmental immunity. They further argued that, along with immunity provided by law, there was a non-governmental basis for summary disposition because there were no genuine issues of material fact.

Plaintiff responded that Germond was not entitled to immunity because he had served his two-year term with the PSAC from 2008-2010 and, therefore, did not enjoy the status of a governmental employee. Plaintiff claimed that Germond was not acting within the scope of any authority when Germond admitted that he knew that his position expired in 2010. In addition, plaintiff argued that the township resolution empowered the PSAC *committee* to advise the Township, not one individual member. Moreover, plaintiff argued that Germond did not act in good faith but, instead, harbored ill will against plaintiff. Plaintiff maintained that there were questions of fact as to whether Germond acted with the intent to harm plaintiff. As for the non-immunity basis for summary disposition, plaintiff argued that there were questions of fact as to whether Germond knowingly made false statements in his two memos or at least entertained serious doubts as to their truth and, therefore, acted maliciously. Regarding plaintiff's ERKA claim, plaintiff argued that Germond's memos alleged that plaintiff committed petty theft of Township property and were the result of a disciplinary investigation.

The trial court ruled that Koehn was entitled to governmental immunity, but concluded that Germond was not similarly entitled to immunity. The trial court further concluded that questions of fact precluded summary disposition on defendants' non-governmental immunity defenses. The trial court denied summary disposition as to plaintiff's ERKA claim. Defendants now appeal from that ruling.[1]

## II. STANDARD OF REVIEW

Summary disposition is appropriate when a claim is barred because of "immunity granted by law." MCR 2.116(C)(7). A party may support a motion under MCR 2.116(C)(7) with affidavits, depositions, admissions, or other documentary evidence. *Odom v Wayne County*, 482 Mich 459, 466; 760 NW2d 217 (2008). "In reviewing a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party." *Tellin v Forsyth Twp*, 291 Mich App 692, 698; 806 NW2d 359 (2011).

"This Court reviews a trial court's decision regarding a motion for summary disposition de novo. A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. A motion for summary disposition under MCR 2.116(C)(10) should be granted if the pleadings, affidavits, and other documentary evidence, when viewed in a light

---

[1] Because the trial court's order denied Germond's motion based on its finding that government immunity did not apply, Germond had an appeal of right pursuant to MCR 7.203(A)(1) and MCR 7.202(6)(a)(v). All defendants filed an application for leave to appeal, raising non-immunity issues. We granted defendants' application and, on our own motion, consolidated the two appeals. *George K Truchan v Charter Twp of Adrian*, unpublished order of the Court of Appeals, entered March 5, 2015 (Docket Nos. 323624 and 323655).

most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Gividen v Bristol West Ins Co*, 305 Mich App 639, 642; 854 NW2d 200 (2014) (internal citations omitted).

## III.  GERMOND WAS ENTITLED TO GOVERNMENTAL IMMUNITY

Germond argues that he was entitled to governmental immunity because, as chairman of the PSAC, he was a governmental volunteer or member of a governmental committee.  We agree.

In *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984), our Supreme Court held that governmental immunity for individuals was provided by the common law.  Certain high-level officials were generally absolutely immune from tort liability, while lower-level officials were immune from tort liability when acting within the scope of employment, acting in good faith, and performing discretionary acts.  *Id*. at 633-634.  When *Ross* was decided, the existing version of MCL 691.1407 only protected agencies, not individuals.  In 1986, the Legislature amended MCL 691.1407.  It currently reads, in relevant part, as follows:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if all of the following are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

> (3) Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986.

> ***

> (5) A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

Accordingly, under the current governmental immunity law for lower-ranking employees, *Odom v Wayne Co*, 482 Mich 459, 479-480; 760 NW2d 217 (2008) sets forth the following test:

> To summarize and simplify the application of our decision, we provide these steps to follow when a defendant raises the affirmative defense of individual governmental immunity. The court must do the following:
>
> (1) Determine whether the individual is a judge, a legislator, or the highest-ranking appointed executive official at any level of government who is entitled to absolute immunity under MCL 691.1407(5).
>
> (2) If the individual is a lower-ranking governmental employee or official, determine whether the plaintiff pleaded an intentional or a negligent tort.
>
> ***
>
> (4) If the plaintiff pleaded an intentional tort, determine whether the defendant established that he is entitled to individual governmental immunity under the Ross test by showing the following:
>
> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial.

We reject plaintiff's contention that because Germond's term technically expired he was no longer an active member of the PSAC. At the very least, Germond remained a volunteer acting on behalf of the PSAC.

Germond testified that when he was first appointed to the PSAC in 2008, he never looked at the June 2005 enabling resolution. He looked at it in 2009 or 2010 "out of curiosity." The enabling resolution provided that members of the PSAC were appointed by the Township Supervisor, subject to approval by the Township Board, for a two-year term. Importantly, *the Township Supervisor would serve as ex-officio member of the PSAC*. Germond did not attend the Township Board meetings so "as far as I would have known I may have been reappointed, I didn't pay any attention to the term on here. . . .[T]he terms were never mentioned and all of the other members on the committee were the same as I had gone on the committee with in 2008." Germond was no longer a citizen of the township, but Koehn told him that he consulted the Michigan Township Association and was told that one person on the PSAC who was outside of the Township would be acceptable.

Germond acknowledged that the PSAC did not authorize him to conduct an investigation or write the memos. Nevertheless Koehn (who served as ex-officio member of the PSAC) told

-5-

Germond to "express my concerns in writing." Germond testified that he wrote the memos in his capacity as a member of the PSAC because the issues relayed information that reliable members of the community had told him. Germond testified that "it wasn't my mission to determine accuracy, I was not conducting an investigation. I was passing on information that had been given to me by reliable people." He added: "I was not quizzing people nor was I conducting any kind of an investigation. Information was coming to me, I guess it's just because I was the chairman of the public safety committee, that's the only thing I can tell you."

Koehn confirmed that he told Germond to put some of his concerns in writing so that Koehn "had a record of it" and so he could discuss the concerns with plaintiff. Koehn also confirmed that no one, including Germond, had ever been reappointed to the PSAC. The resolution was drafted by *plaintiff* and the PSAC continued to meet and make recommendations even after its members' terms had expired. In fact, plaintiff admitted that he helped draft the June 13, 2005 resolution that created the PSAC, whose purpose was to allow a three-member panel to discuss capital expenditures, advise and attempt to gain public support for police and fire millages, and make recommendations regarding manpower. In Koehn's opinion, the PSAC's advisory function regarding manpower included when there was "an issue with an individual." Even plaintiff believed that the Germond letters were the result of Germond investigating and interrogating people "acting as a chairman of the public safety committee."

That Germond was, or reasonably continued to believe he was, a member of the PSAC was confirmed by those around him. Police clerk Sandra Hoffman testified that she believed some positions in the police department needed more oversight. She noted:

> Well, a citizen once talked to me and said if you have a complaint with an officer it's easy, you know where to go, you go right to the police chief, you make your complaint. If you have a complaint with the police chief where do you go and people out there didn't know where to go and, you know, I'd often be asked that so I just thought that well . . . there is no policy. I just mentioned I thought maybe we could use some – use a policy.

She approached Germond about it because she believed plaintiff's inability to follow orders had become "a public safety issue." Hoffman denied that Germond ever approached her for information – "He never asked me anything."

Township office manager Marie Nelson testified that she and Hoffman would often talk about township matters. Marie[2] was concerned that things "were not being taken care of" and things "were going on that not normal employees would be doing." The use of the township car was especially concerning: "I mean, it was noticeable to everybody but then nobody seemed to do anything about it." Marie was not "in a position to myself take care of these things." She identified Germond as the PSAC chairman and brought her concerns to him. "I just remember that one day he came into the office and he said that it didn't look like they had much to talk

---

[2] We use Marie's first name because there is another witness, Dane Nelson, who shares the last name.

about at the public safety meeting and I said really . . .I sit in the middle of this and you observe everything that's going on here and it's like why isn't there any topics for this public safety meeting. So, you know, something needed to be done." She had raised some concern with Koehn who was not interested.

Although Township Police Officer Brett Gilbert testified that Germond approached him and asked him questions about things he had heard in an attempt to "investigate it to try and learn the actual truth," the fact remains that individuals brought these concerns to Germond's attention with the knowledge that Germond was chairman of the PSAC. Again, Germond wrote the memos at Koehn's request. Koehn was Township Supervisor and an ex-officio member of the PSAC and entitled to absolute immunity.

Plaintiff argues that even if Germond could be considered an employee or volunteer, it was clear that Germond harbored ill will against plaintiff. In support of this contention, plaintiff offers the testimony of Dane Nelson and Terrence Collins.

Dane testified that he never had any issues with plaintiff, but "it was clear to me that Mr. Germond really did not care much for Mr. Truchan." On more than one occasion, Germond mentioned:

> Something to do with when Mr. Germond was sheriff, and George was, I believe, a police officer someplace, and I couldn't even tell you where, but it had to do something with either some communication equipment or radio that George had possession of or one of his police officers had possession of, and Mr. Germond thought that he should have it. You know, he mentioned that on more than one occasion, but that was about it.

It would come up in small talk when Dane was city attorney and city manager.

Collins testified that Germond mentioned issues with plaintiff at a Kiwanis meeting: "I don't believe he felt that George was doing the correct job. I think he felt that George was not effective in the performance of his duties. He made mention once of George having one of the township police vehicles outside of his jurisdiction, and I cannot be positive here, but I believe he said up in Detroit."

Both of these statements, even if true, do not show malice, especially in light of the fact that both statements involved the performance of plaintiff's duties. Germond testified that he talked to Koehn at least four or five times before writing the first memo. While in one memo Germond said that plaintiff needed to be "held accountable," Germond testified that he did not mean disciplined. He was referring to Koehn exercising proper supervision and requiring plaintiff to comply with his supervisor. Koehn confirmed that he told Germond to put some of his concerns in writing so that Koehn "had a record of it" and so he could discuss the concerns with plaintiff. Koehn only decided to fire plaintiff after plaintiff repeatedly refused to meet with Koehn.

-7-

Because Germond was, at a minimum, a volunteer and because his acts were undertaken in good faith and without malice, the trial court erred in failing to grant Germond summary disposition on the basis of governmental immunity.[3]

## IV. DEFENDANTS WERE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ERKA CLAIM

Defendants argue that the trial court erred in failing to grant summary disposition on plaintiff's ERKA claim. We agree.

MCL 423.506(1) provides that: "An employer or former employer shall not divulge a disciplinary report, letter of reprimand, or other disciplinary action to a third party, to a party who is not a part of the employer's organization, or to a party who is not a part of a labor organization representing the employee, without written notice as provided in this section."[4]

MCL 423.501(1)(c) provides, in relevant part:

"Personnel record" means a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action. A personnel record shall include a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record as provided in this subdivision. A personnel record shall not include:

\*\*\*

(*iv*) Information of a personal nature about a person other than the employee if disclosure of the information would constitute a clearly unwarranted invasion of the other person's privacy.[5]

---

[3] Because we conclude that Germond was entitled to governmental immunity, we decline to address his non-governmental immunity arguments.

[4] If such a disciplinary report is divulged, "written notice to the employee shall be by first-class mail to the employee's last known address, and shall be mailed on or before the day the information is divulged from the personnel record." MCL 423.506(2).

[5] While plaintiff alleged that defendants violated MCL 423.501(1)(c)(*iv*) by revealing "information of a personal nature about a person other than the employee" where the "disclosure of the information would constitute a clearly unwarranted invasion of the other person's privacy," he has abandoned this claim on appeal by failing to brief the point at all. *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

(*v*) Information that is kept separately from other records and that relates to an investigation by the employer pursuant to section 9.

MCL 423.509 in turn provides:

If an employer has reasonable cause to believe that an employee is engaged in criminal activity which may result in loss or damage to the employer's property or disruption of the employer's business operation, and the employer is engaged in an investigation, then the employer may keep a separate file of information relating to the investigation. Upon completion of the investigation or after 2 years, whichever comes first, the employee shall be notified that an investigation was or is being conducted of the suspected criminal activity described in this section. Upon completion of the investigation, if disciplinary action is not taken, the investigative file and all copies of the material in it shall be destroyed.  [MCL 423.509.]

There is no support for plaintiff's claim that the memos were disciplinary reports to which he was entitled notice, nor were the memos an investigation of criminal charges.

After receiving the May 9th memo, Koehn did not call for a formal investigation:

*Q*.  Upon reading that memo, did you call for a formal investigation by the Michigan State Police of Mr. Truchan?

*A*.  No.

Nor did Koehn believe that the letter accused plaintiff of criminal behavior:

*Q*.  Did you believe that any of the allegations in Mr. Germond's May 9, 2011, memo was accusing Mr. Truchan of having committed a crime?

*A*.  No.

*Q*.  Did you consider any of the concerns expressed in Mr. Germond's May 27 memo as accusing Mr. Truchan of having committed a crime?

*A*.  No.

Koehn did not discuss the allegations in Germond's memos in detail, never conducted an investigation into the allegations, and never formulated an opinion as to whether the allegations were true.  Koehn did not believe that the letter accused plaintiff of criminal behavior.

Koehn was the Township's FOIA coordinator and only learned of ERKA when he was served with the lawsuit.  Koehn created a personnel "file" for plaintiff in June 2011, but denied creating the file to encourage a FOIA request.  Rather, the purpose of creating the file was for ease of reference at meetings.  Koehn was the one who decided what to put in the file.  He consulted Harvey Koselka about what could and could not be shown in a FOIA request.  Koselka was a retired circuit court judge and a fellow member of the Kiwanis Club.

-9-

Absent genuine issue of material fact on this point, the trial court erred in failing to grant defendants summary disposition on plaintiff's ERKA claim.

Reversed and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood