*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF MICHAEL WHYTE, by DANIEL
BERRY, Personal Representative,

UNPUBLISHED
October 17, 2019

Plaintiff-Appellee,

v

No. 343161
Wayne Circuit Court
LC No. 16-009474-NO

DETROIT TRANSPORTATION
CORPORATION, DETROIT PEOPLE MOVER,
EDITH BOWLES, and CYNTHIA GEHLERT,

Defendants-Appellants,

and

JOHN DOE,

Defendant.

Before: METER, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Michael Whyte passed away after suffering lethal injuries when he fell between two train cars at the Detroit People Mover's Times Square Station in Detroit. Whyte's estate filed this lawsuit alleging several negligence claims against the Detroit Transportation Corporation (DTC) and several other defendants. The DTC eventually moved for summary disposition under MCR 2.116(C)(7), arguing that it was entitled to governmental immunity and that no exceptions under the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, applied. The trial court held, in relevant part, that the public-building exception to governmental immunity, MCL 691.1406, was applicable, and therefore denied summary disposition for the DTC. The DTC appeals as of right this portion of the trial court's ruling. We reverse.

In response to the DTC's motion, plaintiff argued, as relevant to this appeal, that two exceptions to governmental immunity applied that prevented summary disposition: (1) the proprietary-function exception because the DTC has multiple income sources, including

-1-

advertising revenue, and (2) the public-building exception because the DTC failed to "repair and maintain" the platform by not installing between-car barriers in purported violation of the Americans with Disabilities Act (ADA), 42 USC 12131 *et seq.*, and by installing surveillance cameras in less-than-ideal locations.

The DTC, on the other hand, argued that neither exception applied. With respect to the proprietary-function exception, the DTC contended that the exception could not apply because providing low-cost public transportation to Detroit residents was not primarily for the purpose of producing a pecuniary profit. As for the public-building exception, the DTC argued that it did not apply because the DTC's failure to install between-car barriers and surveillance cameras in certain locations were allegations of design defects, which are not covered under the public-building exception.

In denying summary disposition, the trial court agreed with the DTC that the proprietary-function exception did not apply, but concluded that the public-building exception did apply. In so holding, the trial court rejected the DTC's argument that plaintiff's allegations were for design defects. The DTC appealed this denial, and the trial court stayed the matter pending resolution of the appeal.

For the reasons stated below, we reverse the trial court's opinion and order denying the DTC's motion for summary disposition and remand for further proceedings.

## I. GOVERNMENTAL IMMUNITY IN GENERAL

We review de novo a trial court's ruling on a motion for summary disposition. *Kendricks v Rehfield*, 270 Mich App 679, 681-682; 716 NW2d 623 (2006). We likewise review de novo questions of statutory interpretation, including the interpretation of the GTLA. *Renny v Dep't of Transp*, 478 Mich 490, 495; 734 NW2d 518 (2007).

When interpreting and applying the GTLA, the goal is "to give effect to the Legislature's intent as expressed in the statutory language." *Id*. When the statutory language is unambiguous, the Legislature's intent is clear and judicial construction is inappropriate. *Id*. The GTLA "affords broad immunity from tort liability to governmental agencies and their employees whenever they are engaged in the exercise or discharge of a governmental function." *Kozak v Lincoln Park*, 499 Mich 465, 467; 885 NW2d 443 (2016). Thus, the GTLA's grant of immunity is broadly construed, and any exceptions to that immunity are narrowly construed. *Grimes v Michigan Dep't of Transp*, 475 Mich 72, 91 n 54; 715 NW2d 275 (2006).

Under section 7 of the GTLA, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function" "[e]xcept as otherwise provided in this act[.]" MCL 691.1407(1). The trial court held that the DTC was a governmental agency engaged in the exercise or discharge of a governmental function and was therefore entitled to governmental immunity. This holding has not been

challenged on appeal.[1]  The only question on appeal is whether one of the exceptions to governmental immunity applies, which is plaintiff's burden to prove.  See *Mack v Detroit*, 467 Mich 186, 201; 649 NW2d 47 (2002).

## II.  THE PUBLIC-BUILDING EXCEPTION

The public-building exception in MCL 691.1406 provides, in relevant part:

> Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

The Michigan Supreme Court interpreted and applied those two sentences in a detailed way in *Renny*, 478 Mich at 500-501, stating:

> The first sentence of MCL 691.1406 states that "[g]overnmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public."  This sentence unequivocally establishes the duty of a governmental agency to "repair and maintain" public buildings.  Neither the term "repair" nor the term "maintain," which we construe according to their common usage, encompasses a duty to design or redesign the public building in a particular manner.  "Design" is defined as "to conceive; invent; contrive."  By contrast, "repair" means "to restore to sound condition after damage or injury."  Similarly, "maintain" means "to keep up" "to preserve."  Central to the definitions of "repair" and "maintain" is the notion of restoring or returning something, in this case a public building, to a prior state or condition.  "Design" refers to the initial conception of the building, rather than its restoration.  "Design" and "repair and maintain," then, are unmistakably disparate concepts, and the Legislature's sole use of "repair and maintain" unambiguously indicates that it did not intend to include design defect claims within the scope of the public building exception.

---

[1] While arguing that the proprietary-function exception should apply, plaintiff states in his brief, "The mere fact that the DTC is subsidized by the government does not make the corporation a government entity."  This sentence could be construed as contending that the DTC is not a governmental agency, though it would make little sense to argue about whether an exception to governmental immunity applies if the entity cannot claim immunity in the first place.  At any rate, to the extent that this sentence could be construed as arguing that the DTC is not eligible to claim governmental immunity, we deem the argument abandoned for failure to adequately brief the issue.  See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999).

The second sentence of MCL 691.1406, which imposes liability on governmental agencies "for bodily injury and property damage resulting from a dangerous or defective condition of a public building," does not expand the duty beyond the repair and maintenance of a public building. The phrase imposes liability where the "dangerous or defective condition of a public building" arises out of the governmental agency's failure to repair and maintain that building. It is not suggestive of an additional duty beyond repair and maintenance. There is no reason to suspect that the Legislature intended to impose a duty to prevent "dangerous or defective condition[s]" in public buildings in a manner wholly unrelated to the obligation clearly stated in the first sentence. [Footnotes omitted.]

In short, the Michigan Supreme Court has established that a design-defect claim does *not* fall within the plain language of the public-building exception. *Renny*, 478 Mich at 505.

In *Renny*, 478 Mich at 493-494, the plaintiff slipped and fell on a snow-and-ice patch on a rest area's sidewalk and alleged that the Michigan Department of Transportation (MDOT) was negligent in "designing, constructing, keeping, and/or maintaining the rest area" by allowing melted snow and ice to accumulate on the sidewalk. The plaintiff "attributed the accumulated snow and ice, in part, to MDOT's failure to install and maintain gutters and downspouts around the roof of the building," and "maintained that the gutters and downspouts would have safely channeled the snow and ice that melted off the roof away from the sidewalks." *Id*. at 494. Although the Supreme Court remanded the matter because "there [was] record evidence suggesting that the rest area was once equipped with gutters and downspouts" which could satisfy the "repair and maintain" requirements, the Court nevertheless made clear that, "to the extent that plaintiff's claim is premised on a design defect of a public building, it is barred by governmental immunity." *Id*. at 506-507.

This Court followed *Renny*'s guidance that the public-building exception does not apply to cases based on design-defect allegations in *Tellin v Forsyth Twp*, 291 Mich App 692; 806 NW2d 359 (2011). In that case, two children were injured after a "wobbly" I-beam fell on them and broke their arms at a 40-year-old Air Force base that had been turned into a township learning center. *Id*. at 696. The plaintiffs sued several governmental defendants, alleging, in relevant part, that the public-building exception to governmental immunity applied because the defendants failed to repair or maintain the I-beam. *Id*. at 697. The trial court found, in relevant part, that the plaintiffs' claim centered on an alleged failure to maintain, and not a design defect, because someone had noticed that "the I-beam configuration . . . seemed loose" and was thus in need of maintenance. *Id*. at 695, 698.

On appeal, the defendants argued that they were immune from liability under the GTLA because "the placement of the steel I-beam configuration was simply a redesign decision that altered the initial conception of the building" and, thus, was a design defect. *Id*. at 700. After recognizing *Renny*'s distinction between "design defect versus repair and maintain," the *Tellin* Court noted "that the *Renny* Court did not explain where the line between the two concepts should be drawn," instead leaving that to trial courts to determine. *Id*. at 703. Accordingly, the *Tellin* Court offered its own understanding of the differences between the two:

-4-

A design defect would appear to consist of a dangerous condition inherent in the design itself, such as its characteristics, functioning, and purpose. . . .

In contrast, a failure to repair or maintain appears to consist of something caused by extrinsic circumstances, such as a malfunction, deterioration, instability, or a fixture that is improperly secured or otherwise improperly constructed or installed. . . . An action could initially be a design decision, but subsequent improper installation, malfunction, deterioration, or instability could later transform this decision into a failure to repair or maintain. [*Id*. at 705-706 (footnotes omitted).]

Applying this framework, the *Tellin* Court determined that the "plaintiffs were not injured because of an inherent characteristic of the I-beam configuration when coupled with the roof overhang[.]" *Id*. at 706. Rather, the I-beam was installed as a "preventive measure" to support "the existing structure," and "[a]ny defective condition was not from the I-beam's inherent characteristics but from the [defendants'] failure to properly maintain the stability of the I-beam configuration." *Id*. at 707. The *Tellin* Court ultimately concluded:

Apart from the initial placement of the I-beam configuration, once it was installed, the [defendants] had a continuing duty to repair and maintain it if it became loose, damaged, or unstable. This case is thus further distinguishable from *Renny* because the only way to remedy the situation in *Renny* was to install a new gutter system. In contrast, the [defendants] could have remedied the condition at issue here had they performed regular maintenance to test the stability of the I-beam structure, which would likely have disclosed any instability. This failure to repair or maintain is further illustrated by the fact that the Townships had knowledge that this I-beam configuration was not secured. Therefore, we conclude that the trial court did not err when it characterized plaintiffs' injuries as resulting from a failure to repair or maintain the building. [*Id*. at 707 (footnotes omitted).]

In light of *Renny* and *Tellin*, it is our view that, in order for the public-building exception to governmental immunity to apply, a plaintiff's claims must allege that the governmental defendant needed but failed to fix something pertaining to the building. Plaintiff's claims here do not do so.

Regarding the surveillance cameras, plaintiff alleged "that this surveillance infrastructure was defective and not properly maintained" because it did not allow "proper coverage of the area in question." Plaintiff alleged that the surveillance cameras should have been installed in a manner so that "Plaintiff's Decedent's fall would have been fully visualized, providing Defendants with an appreciable period of time to stop the train from progressing, entirely preventing Decedent Whyte's death." Clearly, plaintiff is alleging not that the cameras needed to be fixed but that they should have been installed in a different location. The dangerous condition that the placement of the cameras created, according to plaintiff, is that the DTC controllers could not "fully visualize[]" the area where Whyte fell. This dangerous condition, however, was "inherent in the design itself[.]" *Tellin*, 291 Mich App at 705. That is, the controllers could not "fully visualize[]" the area where Whyte fell *because* the DTC decided to place the cameras

where it did. Thus, plaintiff's camera-related claim is alleging a defect in the platform's design. And because a design-defect claim does not fall within the plain language of the public-building exception, *Renny*, 478 Mich at 505, we hold that plaintiff's claims against the DTC, to the extent they rely on allegations about the surveillance cameras, are barred by governmental immunity.

We reach the same holding with respect to plaintiff's claims based on the between-car barriers. Plaintiff alleged that "the Times Square Station platform was structurally defective in that the structure of the platform allowed for the public to access the area between the train cars" as well as "the rails . . . when a train is waiting to be boarded." Plaintiff does not, however, allege that there was something already installed in the building that needed to be fixed. Plaintiff's claims, to the extent they center on the lack of between-car barriers, focus on an inherent problem with the platform as conceived and constructed, rather than extrinsic circumstances, such as an already-installed between-car barrier that became loose or unstable. That is, plaintiff's complaint is with the design of the platform, not with a condition of the platform that needed to be repaired or that was not properly maintained. Accordingly, we hold that plaintiff's claims against the DTC, to the extent they rely on allegations about the lack of between-car barriers, are barred by governmental immunity.

We are not persuaded by plaintiff's and the trial court's reliance on purported violations of the ADA. Assuming without deciding that the DTC's failure to have installed between-car barriers prior to Whyte's death did, in fact, violate the ADA, we have found no legal authority supporting the theory that an ADA violation, by itself, requires a governmental entity to "repair and maintain" under the public-building exception. Although evidence of a statutory violation creates a rebuttable presumption of negligence, see, e.g., *Klanseck v Anderson Sales & Serv, Inc*, 426 Mich 78, 86; 393 NW2d 356 (1986), a statutory violation, alone, is not one of the six narrowly-tailored exceptions to governmental immunity, see *Goodhue v Dep't of Transp*, 319 Mich App 526, 531 n 1; 904 NW2d 203 (2017). Thus, evidence of the violation alone does not avoid governmental immunity under the public-building exception.

In arguing that the DTC's failure to install the between-car barriers falls within the public-building exception, plaintiff points out that the *Renny* Court defined "maintain," in part, as "to keep up." *Renny*, 478 Mich at 501. Plaintiff expounds that the DTC was required "to keep up" with ADA regulations, and its failure to do so amounts to a failure to "maintain" the platform. Yet plaintiff seems to ignore that, when defining "maintain" in the public-building exception, the *Renny* Court explained, "Central to the definitions of 'repair' and 'maintain' is the notion of restoring or returning something, in this case a public building, to a prior state or condition." *Id*. Clearly, installing something new to the platform[2] is not "restoring or returning" it "to a prior state or condition." Thus, regardless whether the lack of between-car barriers amounts to a code or ADA violation, plaintiff's claim ultimately constitutes a design defect and therefore does not fall within the public-building exception pursuant to *Renny*. In so ruling, we

---

[2] Nothing in the record suggests that there has been any change in regard to between-car barriers since the platform was constructed.

emphasize that any exception to the GTLA's broad grant of immunity—which includes the public-building exception—is narrowly construed. *Grimes*, 475 Mich at 91 n 54.

Plaintiff's reliance on *Green v State*, 30 Mich App 648; 186 NW2d 792 (1971), and *Velmer v Baraga Area Sch*, 430 Mich 385; 424 NW2d 770 (1988), is misplaced. Both cases dealt with whether pieces of heavy-duty equipment were fixtures and thus subject to the public-building exception. See *Green*, 30 Mich App at 655; *Velmer*, 430 Mich at 390-396. Both cases were decided before *Renny*, and neither dealt with the distinction between design defects and a failure to repair and maintain. Thus, neither case assists us in deciding the issue now before us. Moreover, because the cases were decided pre-*Renny*, neither provides a sufficient explanation of what caused the purported failure to the equipment's safety devices.[3] Were they, like this case, simply designed that way? Or were they installed with the proper safety devices but, because of extrinsic forces, in need of repair or maintenance? Without being able to answer these questions, we cannot conclude that *Green* or *Velmer* support a different result here.

For these reasons, we hold that the trial court erred in deciding that plaintiff met his burden of establishing that the public-building exception to governmental immunity applied.

### III. THE PROPRIETARY-FUNCTION EXCEPTION

Plaintiff alternatively argues that we should nevertheless affirm the trial court's denial of the DTC's motion for summary disposition based on the proprietary-function exception. "A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003). We conclude, however, that the trial court did not reach the right result.

The proprietary-function exception to governmental immunity is codified in MCL 691.1413, which states in relevant part:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees.

"Therefore, to be a proprietary function, an activity: (1) must be conducted primarily for the purpose of producing a pecuniary profit; and (2) it cannot be normally supported by taxes and fees." *Goodhue*, 319 Mich App at 532 (quotation marks and citation omitted).

As explained by this Court in *Goodhue*, 319 Mich App at 532:

---

[3] Both courts concluded, without discussion, that, for a fixture located in a public building, a safety defect in the fixture falls under the public-buildings exception to governmental immunity. See *Green*, 30 Mich App at 655; *Velmer*, 430 Mich at 396.

The first prong of the proprietary function test has two relevant considerations. First, whether an activity actually generates a profit is not dispositive, but the existence of profit is relevant to the governmental agency's intent. Importantly, [a]n agency may conduct an activity on a self-sustaining basis without being subject to the proprietary function exemption. Second, where the profit is deposited and where it is spent indicate intent. If profit is deposited in the general fund or used on unrelated events, the use indicates a pecuniary motive, but use to defray expenses of the activity indicates a nonpecuniary purpose. [Quotation marks and citations omitted; alteration in *Goodhue*.]

In *Goodhue*, 319 Mich App at 534, this Court concluded that the operation of the Blue Water Bridge in Port Huron was not a proprietary function. In doing so, it pointed to the following factors:

- "the Blue Water Bridge receives income from a variety of sources but that the primary sources is from tolls,"

- "all monies are placed in the same Blue Water Bridge subfund, which is part of the state's trunk-line fund,"

- "the money is used solely 'for the operation of the Blue Water Bridge,'" and

- "in addition to daily operations, money from the subfund is used for capital projects and to pay debt service on bonds that were issued for projects associated with the Blue Water Bridge." [*Id*. at 533.]

The *Goodhue* Court rejected the plaintiff's emphasis on evidence that the defendant's income exceeded its expenses over the previous several years, as well as the assertion "that the operation of the Blue Water Bridge has a real purpose to increase the 'profit' of the state because any Blue Water Bridge expansion project will generate significant tax revenue for the state." *Goodhue*, 319 Mich App at 533. The *Goodhue* Court concluded, "In sum, there is no evidentiary support for the contention that the primary purpose in running an efficient international bridge crossing is to improve the financial bottom line of any other government." *Id*.

To support his position that the real purpose of the Detroit People Mover was to make a profit for the DTC, plaintiff relies in part on deposition testimony from one of the DTC's controllers. She testified, in relevant part, that

- "approximately 90 percent of [DTC's] operational budget" comes from "various local, state and federal public funding,"

- the DTC charges riders "75 cents" per ride, which "is used to defray the $5.85 it costs for that ride," i.e., "[t]he operating cost to carry one rider,"

- "[w]e don't make a profit," and "we never have had a profit" because "[i]t's really all losses,"

-8-

- the DTC makes money from selling advertising space, which "is used to defray the cost of generating that revenue for advertising,"

- the DTC invests in capital assets, which apparently includes "artwork,"

- the DTC has over $47 million in assets, which "would be any and all of [its] cash accounts, prepaid expenses, inventory and any deferred . . . assets now as well as for pension," and

- the DTC receives "rental income" from a clothing store "for a lot [it has] over on Broadway underneath [its] guideway, that's $375 a month that [it] receive[s], and the remainder, the miscellaneous is mainly proceeds from insurance companies . . . ."

According to the controller, the 75-cent fares are "deposited in a general fund" and "used to defray the primary expense of the operation of the People Mover," the subsidies that come in "are used, again, for the primary expense of the operation of the People Mover," the rental income is used for "[o]perating expenses" meaning "the primary expenses of operating the People Mover," and any "miscellaneous revenue" is also "used for the primary expense of operating the People Mover." Indeed, the only income that did not go to "the primary expense of the operation of the People Mover" was the advertising income, which the controller agreed "goes toward the advertising of the People Mover."

The circumstances in this case are largely indistinguishable from those in *Goodhue*. In both cases, the governmental entity received income from a variety of sources, placed all of the income in the same fund, and used the money exclusively or almost exclusively to operate. In *Goodhue*, the only exception was that "money from the subfund [was also] used for capital projects and to pay debt service on bonds," *Goodhue*, 319 Mich App at 534, and here the only exception is that advertising income is used for other advertising. Plaintiff's argument that this is a proprietary function because advertising income is used for advertising-related purposes— meaning purposes other than the "operation" of the Detroit People Mover—is not persuasive. Ultimately, nothing in the record demonstrates that the Detroit People Mover was "conducted primarily for the purpose of producing a pecuniary profit," nor does anything demonstrate that low-cost mass transportation is an activity that is not "normally supported by taxes and fees." *Goodhue*, 319 Mich App at 532 (quotation marks and citation omitted). Again, "it is the responsibility of the party seeking to impose liability on a governmental agency to demonstrate that its case falls within one of the exceptions." *Mack*, 467 Mich at 201. And the controller's deposition testimony that the DTC used advertising income for advertising-related purposes is not enough to meet that burden. Accordingly, we hold that the trial court properly concluded that plaintiff did not meet his burden to show that the proprietary-function exception to governmental immunity applies.

In sum, the trial court erred when it held that plaintiff met his burden to show that the public-building exception to governmental immunity applied based on the DTC's failure to install between-car barriers and its purported failure to install surveillance cameras in certain locations. Plaintiff also failed to establish that the People Mover had a proprietary function. We therefore reverse.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle